UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN
CIVIL ACTION NO. 1:04CV-00056-JHM

UNITED STATES OF AMERICA                                          PLAINTIFF

VS.

250 LINDSAY LANE,
RUSSELLVILLE, KENTUCKY, ET AL.                                  DEFENDANTS


CRIMINAL ACTION NO. 1:04CR-00034-JHM

UNITED STATES OF AMERICA                                          PLAINTIFF

VS.

MICHAEL P. STEVENS, M.D., ET AL.                               DEFENDANTS


<u>**MEMORANDUM OPINION**</u>

<u>**BACKGROUND**</u>

Before the Court is the motion of Defendants, Michael Patrick Stevens ("Dr. Stevens"), Jody K. Stevens ("Mrs. Stevens"), and Edward Bailey ("Mr. Bailey"), for a hearing on pretrial restraint of assets needed to pay legal fees and defense costs (DN 25). Plaintiff has filed a response (DN 26), supplemental response (DN 29) and Defendants have filed a reply (DN 30).

By order entered January 24, 2005, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) (DN 21). After reviewing the memoranda and affidavits submitted by the parties, the undersigned scheduled an evidentiary hearing limited in scope to the $203,569.34 being held , pursuant to an agreed order, by the United States Marshal's Service ("USMS") (DN 31). Prior to the evidentiary hearing, the United States of America ("United States") and Mr. Bailey reached an agreement regarding his claim to a portion of

that money (DN 35).

The undersigned conducted the evidentiary hearing on May 27, 2005 (DN 37). Present during the hearing were Dr. and Mrs. Stevens and their retained counsel Messrs. M. Stephen Pitt and Peter L. Ostermiller; as well as Assistant United States Attorney Amy M. Sullivan for the United States (DN 37). During the hearing, the parties presented exhibits as well as testimony from Mrs. Stevens, FBI Special Agent Linda Carrithers and FBI financial analyst Jennifer Ratterman (DN 36, 37).[1] Pursuant to an order from the undersigned (DN 37), the parties simultaneously filed post-hearing briefs (DN 44, 45) followed by responses (DN 47, 48). The undersigned concludes this matter is ripe for determination.

<u>FINDINGS OF FACT</u>

On April 5, 2004, the United States filed a sealed verified complaint for forfeiture *in rem* against the known real property of Defendants (DN 2, 3, 4; 1:04CV-56). The verified complaint alleges that proceeds from healthcare fraud are traceable to the Defendants' real property located at 250 Lindsey Lane, 151 West 5th Street, 117 Pembroke Lane, and 206 Lindsey Lane in Russellville, Kentucky as well as 8138 Saratoga Drive, condominium unit number 2203, and 8134 Saratoga Drive, condominium unit number 2303, in Naples, Florida (DN 2; 1:04CV-56).

---

[1]The Stevens submitted a copy of bills sent to them from the law firm of Wyatt, Tarrant & Combs, Exhibit 1; a recap of bill totals from Wyatt, Tarrant & Combs, Exhibit 2; a chart prepared by counsel for Defendants, Exhibit 3; a chart showing percentage of untainted medicare/medicaid proceeds, Exhibit 4; and a May 25, 2005 facsimile from the United States to defense counsel regarding the seizure warrant of 250 Lindsay Lane, Exhibit 5 (DN 37).

The United States of America presented as exhibits an estimated percentage of fraudulent claims paid to Dr. Stevens, Exhibit 1, and a chart of assumed legitimate claims versus business expenses, Exhibit 2 (DN 37).

Additionally, the United States filed a notice of Lis Pendens against each piece of real property identified above.  On June 17, 2004, the district judge granted the motion to unseal filed by the United States (DN 5, 6; 1:04CV-56).  On July 2, 2004 and on September 28, 2004, the district judge signed an agreed order staying the civil forfeiture action (DN 9, 10, 17, 18; 1:04CV-56).

The Stevens and the United States subsequently entered into an agreed order that allowed them to sell their condominium at 8138 Saratoga Drive, unit number 2203, in Naples, Florida (DN 15, 16; 1:04CV-56).  Mr. Bailey and his wife also entered into an agreed order with the United States that allowed them to sell their condominium at 8134 Saratoga Drive, unit number 2303, in Naples, Florida (DN 8; 1:04CV-56).  Pursuant to the terms of these agreed orders, the USMS took custody of the net proceeds from the sale of both condominiums (DN 8, 16; 1:04CV-56).  The net proceeds from the sale of both condominiums was $203,569.34 (DN 31).

Meanwhile, on October 6, 2004, a Grand Jury in the Western District of Kentucky, Bowling Green Division, issued a 23 count indictment (DN 1, 1:04CR-0034).  The indictment charges that beginning on or about July of 1997 and continuing until at least August 1, 2004, Dr. Stevens, Mrs. Stevens, and her father Mr. Bailey conspired to defraud health care benefit programs (Count 1) and committed health care fraud by falsely billing Medicaid and Medicare for millions of dollars of pain management services through Logan Pain Management Center ("LPMC") and Judith E. Bailey, Inc. (Counts 1-16) (DN 1, 1:04CR-034).  The indictment also charges that beginning on or about January 3, 2002 and continuing until April 25, 2002, Mrs. Stevens and her father Mr. Bailey conspired to commit health care fraud (Count 17) and committed health care fraud by falsely billing Medicare for $10,403 of pain management procedures that were not actually performed on Mr. Bailey, a Medicare recipient (Counts 18-22) (DN 1, 1:04CR-034).  The final count

3

to the indictment seeks forfeiture of all real and personal property derived, directly or indirectly, from gross proceeds traceable to the offenses charged in Counts 2 through 16 (DN 1, 1:04CR-034).

On February 11, 2005, the Stevens and Mr. Bailey filed their motion for hearing on pretrial restraint of assets needed to pay legal fees and defense costs along with supporting affidavits and a memorandum (DN 25; 1:04CV-56).  Initially, they argued the Court should conduct a post-seizure hearing as to the remaining properties in Russellville, Kentucky and the money being held by the USMS (DN 25; 1:04CV-56).  However, in their reply memorandum the Defendants conceded the scope of the hearing should be limited to the money held by the USMS because a Lis Pendens filed against real property does not constitute a seizure (DN 26, 30; 1:04CV-56).

After reviewing the memoranda submitted by the parties and the applicable law, the undersigned concluded the $203,569.34 held by the USMS is the only property of the Defendants that is presently restrained or seized (DN 31; 1:04CV-56).  For this reason, the undersigned found, with the exception of this money, Defendants' motion not well taken (DN 31; 1:04CV-56).

After reviewing their affidavits, the undersigned concluded that Defendants have made a prima facia showing that they have no assets other than the $203,569.34 held by the USMS to pay their retained private counsel (DN 31; 1:04CV-56).  United States v. Jones, 160 F.3d 641, 647 (10th Cir. 1998);  United States v. St. George, 241 F.Supp.2d 875, 878-879 (E.D. Tenn. 2003); United States v. Jamieson, 189 F.Supp.2d 754, 757 (N.D. Ohio 2002).  Additionally, in light of the Government's concession (DN 26) and statements in Defendants' affidavits, the undersigned found there is a bona fide reason to believe that the Grand Jury erred in determining all of these presently restrained assets constitute or are derived, directly or indirectly, from gross proceeds traceable to

4

the commission of the charged offenses in the indictment (DN 31; 1:04CV-56).  Jones, 160 F.3d at

647.  For these reasons, the undersigned concluded an evidentiary hearing was appropriate (DN 31;

1:04CV-56).

Prior to the evidentiary hearing, the United States of America ("United States") and

Mr. Bailey reached an agreement regarding his claim to a portion of that money (DN 35).  Thus, it

appeared the scope of the hearing would be limited to the net proceeds of $98,789.23 from the sale

of the Stevens' condominium in Naples, Florida, which is being held by the USMS.

However, during the evidentiary hearing counsel reported that the Stevens sold their

home at 250 Lindsey Lane, in Russellville, Kentucky, and the FBI seized the net proceeds of the sale

pursuant to a seizure warrant signed by Magistrate Judge Moyer (DN 36, Transcript at 9-11, 77;

1:04CV-56).  Counsel reported the net proceeds from the April 4, 2005 sale are $34,553.06 (DN 36,

Transcript at 9-11, 77; 1:04CV-56).  These net proceeds are also being held by the USMS (DN 36,

Transcript at 9-11, 77; 1:04CV-56).  Thus, the total amount currently held by the USMS is

$133,342.29 (DN 36, Transcript at 9-11, 77; 1:04CV-56).  The undersigned directed counsel to

present evidence regarding the Stevens' claim to both sums held by the USMS (DN 36, Transcript

at 11, 77-78; 1:04CV-56).

The first part of the evidentiary hearing focused on the question whether the Stevens

need the money held by the USMS to fund their legal defense.  In essence, Mrs. Stevens testimony

indicates they do not have any income, they have exhausted all available financial assistance from

family and friends, their debts are significant, and they have sold most of their unencumbered

personal property--from bedroom furniture to toiletries--in order to survive (DN 36, Transcript 12-

77; 1:04CV-56).  After considering the testimony from Mrs. Stevens and Special Agent Ratterman,

the affidavits submitted in support of the motion, and the exhibits presented during their testimony, the undersigned found the Stevens had demonstrated by a preponderance of the evidence that they need the money held by the USMS to fund their legal defense because they do not have any income or assets, other than those restrained, to retain private counsel and provide for themselves (DN 36, Transcript 12-77; 1:04CV-56).

The second part of the evidentiary hearing focused on the question whether there is probable cause to believe that any or all of the restrained money is traceable to the charged offenses (DN 36, Transcript 78-134; 1:04CV-56).  According to the indictment, the relevant time frame is July 1997 through August 1, 2004 (DN 1, 1:04CR-0034).  Thus, the relevant time frame is approximately 85 months in duration.

During this phase of the evidentiary hearing, the undersigned heard testimony from Ms. Ratterman, a financial analyst employed by the FBI, and viewed exhibits presented during direct and cross examination (DN 36, Transcript 78-134; 1:04CV-56).  Ms. Ratterman testified that LPMC was incorporated on July 1, 2000 (DN 36, Transcript at 116-117; 1:04CV-56).  Based on a review of their tax returns, Ms. Ratterman calculated that 95.5% of the Stevens' income came from LPMC each year (DN 36, Transcript at 92; 1:04CV-56).

In essence, Ms. Ratterman's testimony indicates if you include the private pay data with the Medicare and Medicaid data, the total amount of the claims during the relevant time frame are $5.7 million (DN 36, Transcript at 113; 1:04CV-56).  Ms. Ratterman has determined that at least $4.7 million of those claims are fraudulent (DN 36, Transcript at 113; 1:04CV-56).  Thus, the current estimated percentage of fraudulent claims paid to LPMC is approximately 82 % (DN 36, Transcript 86-89, 113-114 and Government's Exhibit 1; 1:04CV-56).  Stated differently,

approximately 18% of the claims paid during the relevant time frame are legitimate or untainted (DN 36, Transcript at 114;1:04CV-56). Thus, the legitimate claims paid to LPMC during the relevant time frame amount to $952,981.74 (DN 36, Transcript at 114-115; 1:04CV-56). Assuming the relevant time frame is 85 months, then approximately $11,211.55 of LPMC's monthly gross income came from legitimate claims. However, Ms. Ratterman testified that LPMC's business expenses, less compensation to the Stevens, exceeded the legitimate claims paid to LPMC each year (DN 36, Transcript 89-92, 133-134 and Government's Exhibit 2; 1:04CV-56).

The Stevens purchased their condominium in Naples, Florida, on August 5, 2003 and sold it on August 10, 2004. Thus, they purchased their condominium during the relevant time frame and sold it approximately nine days after it ended. Ms. Ratterman's testimony showed that by three separate checks the Stevens initially paid $70,373.33 towards the purchase price of the Florida condominium (DN 36, Transcript at 93; 1:04CV-56). Ms. Ratterman indicated that the source of these funds can be traced back to LPMC's bank account (DN 36, Transcript at 93-94; 1:04CV-56). The mortgage payments were made electronically from the Stevens' personal checking account (DN 36, Transcript at 94; 1:04CV-56). The original amount of the mortgage was $243,200.00 when the Stevens purchased the condominium on August 5, 2003 (DN 36, Transcript at 104; 1:04CV-56). When the Stevens sold it on August 10, 2004, the mortgage payoff figure was $243,051.41 (DN 36, Transcript at 95, 105;1:04CV-56). The net proceeds from the sale of the condominium are $98,789.23 (DN 36, Transcript at 105-106; 1:04CV-56).

The Stevens purchased their home at 250 Lindsey Lane in Russellville, Kentucky, for $236,500.00 on August 21, 1996 (DN 36, Transcript at 95; 1:04CV-56). Thus, the Stevens purchased their home almost a year prior to when the indictment alleges the health care fraud began.

The Stevens made an escrow payment of $500 plus they paid $32,000 at the closing (DN 36, Transcript at 96, 128; 1:04CV-56).  Since the settlement costs were $9,453.86, the Stevens initially paid $23,046.14 toward the purchase price of the home (DN 36, Transcript at 96, 128; 1:04CV-56).

The United States concedes this down payment and the mortgage payments from September 1996 through June 1997 came from a source other than LPMC (DN 45 at 5).  Ms. Ratterman's testimony indicates although she did not have all of the banking records, she was able to trace approximately $115,000 in mortgage payments back to the Stevens' personal joint checking account (DN 36, Transcript at 97, 129; 1:04CV-56).  Further, Ms. Ratterman testified that on December 12, 2003, the Stevens took out an equity line in the amount of $60,000 that was secured by a second mortgage on the 250 Lindsay Lane property (DN 36, Transcript at 96-98, 130;1:04CV-56).

The Stevens sold their home on April 4, 2005 for $279,000 (DN 36, Transcript at 96, 106; 1:04CV-56).  Ms. Ratterman's testimony indicates the payoff on the first mortgage was $162,142.10 and the payoff on the second mortgage was $59,293.11 (DN 36, Transcript at 96; 1:04CV-56).  The net proceeds from the sale of 250 Lindsey Lane are $34,553.06 (DN 36, Transcript at 106; 1:04CV-56).

<u>CONCLUSIONS OF LAW</u>

As previously mentioned, $98,789.23 of the Stevens' money is being held by the USMS pursuant to an agreed order (DN 16; 1:04CV-56).  In relevant part, the agreed order reads as follows:

"Plaintiff and the owners hereby agree to substitute the net proceeds realized from the sale of the defendant property as a 'substitute res' for the defendant property in

8

> this lawsuit.  The net proceeds shall be remitted to the custody and control of the United States Marshal Service as the substitute res in this case, and held pending final adjudication or further order of the Court."

(DN 16; 1:04CV-56).  An additional $34,553.06 of the Stevens' money is being held by the USMS after the FBI executed a seizure warrant signed by Magistrate Judge Moyer.  The United States will not release these funds to the Stevens.  Thus, the $133,342.29 held by the USMS is property restrained or seized by the Government.

The procedural aspect of the Fifth Amendment Due Process Clause guarantees that government action may not deprive an individual of life, liberty, or property unless the government provides a fair procedure to contest the deprivation.  United States v. Jones, 160 F.3d 641, 645 (10th Cir. 1998) (citing the United States Constitution, Amendment V).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Jones, 160 F.3d at 645 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

In order to determine whether due process requires some form of post-restraint, pre-trial hearing the Court must consider the private interests affected by the restraint; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of an adversarial hearing; and the United States' interest, including the administrative burden that an adversarial hearing would impose.  Jones, 160 F.3d at 645 (citations omitted).  Here, the private interests at stake are the Stevens' qualified right to counsel of choice, an essential component of the Sixth Amendment right to counsel, and their interest in paying for ordinary and necessary living expenses until conclusion of their trial.  Jones, 160 F.3d at 646; United States v. Michelle's Lounge, 39 F.3d 684, 694-695 (7th Cir. 1994).  While the grand jury findings and issuance of the seizure

9

warrant[2] are based upon a showing of probable cause following an ex parte presentation of information, the risk of an erroneous deprivation of the Stevens' private interests is strong here because the Government concedes not all of the income LPMC received is tainted.  Clearly, an adversarial hearing will serve to diminish the risk of an erroneous deprivation at a meaningful time. Unquestionably, the Government's interest in preserving forfeitable assets weighs heavily in the analysis.  By contrast, the administrative burden that an adversarial hearing will impose is not a heavy factor herein.  In sum, after weighing the above interests, the undersigned determined that due process requires some form of a post-restraint, pre-trial hearing (DN 31).

In reaching the above conclusion, the undersigned considered whether the Stevens had filed a properly supported motion. Jones, 160 F.3d at 647.  Through their affidavits, the Stevens made a prima facia showing that they have no assets other than the money held by the USMS to pay their retained private counsel (DN 31; 1:04CV-56).  Jones, 160 F.3d at 647; United States v. St. George, 241 F.Supp.2d 875, 878-879 (E.D. Tenn. 2003); United States v. Jamieson, 189 F.Supp.2d 754, 757 (N.D. Ohio 2002).  Additionally, the Stevens made a prima facie showing of a bona fide reason to believe that the Grand Jury erred in determining that all of the presently restrained asset constitute or is derived, directly or indirectly, from gross proceeds traceable to the commission of

---

[2]During the hearing the United States asserted a post-restraint, pre-trial hearing should not be conducted as to the $34,533.06 taken pursuant to a seizure warrant  (DN 36, Transcript at 77, 137; 1:04CV-56).  The United States reasoned that a judicial determination of probable cause had already been made by the magistrate judge who signed the seizure warrant (DN 36, Transcript at 77, 137; 1:04CV-56).  Despite the undersigned's request (DN 36, Transcript at 137; 1:04CV-56), the United States did not brief this issue (DN 45, 47).  Notwithstanding, the undersigned concludes there is no merit to the Government's position.  See United States v. Farmer, 274 F.3d 800, 804-806 (4th Cir. 2001) (Court found defendant entitled to a due process hearing as to assets seized by warrant).

the charged offenses in the indictment (DN 31; 1:04CV-56).  Jones, 160 F.3d at 647; St. George, 241 F.Supp.2d at 878-879; Jamieson, 189 F.Supp.2d at 757.

        In an effort to more fully develop the record regarding the Stevens financial circumstances, the first part of the hearing focused on whether the Stevens need the money presently held by the USMS in order to fund their legal defense (DN 31; 1:04CV-56).  As previously indicated, at the completion of this part of the hearing the undersigned found that the Stevens had satisfied their burden (DN 36, Transcript at 12-77; 1:04CV-56).

        The undersigned then conducted an adversarial hearing to determine whether there is probable cause to believe that all of the assets held by the USMS are traceable to the underlying criminal offenses.  United States v. Melrose East Subdivision, 357 F.3d 493, 504, 505 (5th Cir. 2004) ("the proper standard for judging the government's showing is probable cause"); Jones, 160 F.3d at 647 ("the government must establish probable cause to believe that the restrained assets are traceable to the underlying offense"); Cf United States v. Farmer, 274 F.3d 800, 805 (4th Cir. 2004) (the movant must rebut by a preponderance of the evidence the government's showing of probable cause); United States v. Michelle's Lounge, 39 F.3d 684, 701 (7th Cir. 1994) (the movant must rebut the government's showing of probable cause).  In this context, probable cause is defined "as 'a reasonable ground for belief ... supported by less than prima facia proof but more than mere suspicion.'" Melrose East Subdivision, 357 F.3d at 505-506 (quoting United States v. 1988 Cutlass Supreme 2 Door, 983 F.2d 670, 674 (5th Cir. 1993)).  "The probable cause determination in forfeiture cases looks to all of the circumstances and 'must be judged ... with a common sense view to the realities of normal life.'"  Melrose East Subdivision, 357 F.3d at 506 (quoting United States v. One Gates Learjet, 861 F.2d 868, 870 (5th Cir. 1988)).  While the scope of the post-restraint inquiry is

limited to traceability of the assets, the United States may describe and explain the underlying charges and the Court must take those allegations of the indictment as true and assume at the hearing that the underlying offenses have been committed.  Jones, 160 F.3d at 648.

In regard to their home at 250 Lindsey Lane, the Stevens made a $23,046.14 down payment and mortgage payments from September 1996 through June 1997 with untainted funds. However, the Stevens consumed the untainted equity when they utilized the $60,000 available through the equitable line of credit.  Beginning July 1997, the mortgage payments for the 250 Lindsey Lane property can be traced back to LPMC's bank account.  The evidence shows from July 1, 1997 through August 1, 2004 approximately 18% of the money deposited into the LPMC bank account was not tainted.

In regard to the condominium, the down payment and all mortgage payments are traceable back to LPMC's bank account.  The United States argues during the time period the Stevens purchased the condominium the percentage of tainted money deposited into LPMC's bank account was 86.8% (DN 45 at 4 and foot note 2; DN 26, Exhibit E2a).  The Government's reliance on this percentage figure is misplaced because it is based only on Medicare and Medicaid data (DN 26, Exhibit E2a).  Ms. Ratterman's testimony during the evidentiary hearing indicates if you include the private pay data with the Medicare and Medicaid data the percentage of fraudulent claims paid to LPMC is 82% (DN 36, Transcript at 86-89, 113-114 and Government's Exhibit 1; 1:04CV-56). In sum, the evidence shows during the relevant time frame approximately 18% of the money deposited into the LPMC bank account was not tainted.

Not surprisingly, the Stevens argue the down payment on the condominium and the mortgage payments on the condominium and home are but a fraction of the $952,981.74 in untainted

income that LPMC received and, thus, the Court should find the entire $133,342.29 in net proceeds from the sale of both properties is untainted money (DN 44, 48). Equally expected, the United States argues since LPMC's business expenses each year exceeded its untainted annual income, the Court should find the net proceeds from the sale of both properties is exclusively tainted money (DN 45, 47). Notably, both arguments assume the Stevens were able to distinguish between the tainted and untainted income, and they consciously directed this income in a particular direction. In the absence of credible evidence to support such an unlikely assumption, the undersigned discounts both arguments.

Looking at all of the circumstances and judging them with a common sense view to the realities of normal life, the United States has demonstrated there is probable cause to believe that 82% of the money presently held by the USMS is tainted. This means 18% of the $133,342.29 held by the USMS or $24,001.61 is untainted money. This untainted money should be turned over to the Stevens to pay their legal fees and defense costs.

For the foregoing reasons, the undersigned will in a separate order grant in part the motion of Dr. and Mrs. Stevens (DN 25). Further, in that separate order the undersigned will direct the United States Marshal's Service to immediately release to the Stevens the sum of $24,001.61, which is 18% of the $133,342.29 being held by the United States Marshal's Service.

Copies: